IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ROYAL MARCO POINT I
CONDOMINIUM ASSOCIATION, INC.,

                    Plaintiff,          Case No. 3:07 CV 16

-vs-

                                        <u>MEMORANDUM OPINION</u>

QBE INSURANCE CORPORATION,

                    Defendant.

KATZ, J.

This matter is before the Court on the motion of the defendant, QBE Insurance Corporation ("QBE"), for summary judgment (Doc. 216), and the response thereto (Doc. 219) filed by the plaintiff, Royal Marco Point I Condominium Association ("Royal Marco"). Also pending at present is QBE's motion to dismiss or strike Royal Marco's punitive damages claim (Doc. 142). The motions will be denied.

**I. Background**

Royal Marco is a not-for-profit Florida corporation operating 125 condominium residences as well as additional common amenities on Marco Island, Florida. QBE is a Pennsylvania corporation, with its principal place of business in New York, that engages in the business of issuing property and casualty insurance policies in Florida and throughout the United States. QBE issued to Royal Marco a Commercial Insurance Policy numbered QF3839-01 which covered insured's real property, with effective dates from February 26, 2005 to February 26, 2006.

On or about October 24, 2005, Hurricane Wilma made landfall in Florida, causing significant damage to the insured premises at Royal Marco. Royal Marco submitted a claim on October 26, 2005. On November 1, 2005, a preliminary inspection by QBE's adjuster, Advantage

Adjustment Company (AAC), revealed "extensive damage" at Royal Marco exceeding $1 million. Royal Marco began submitting bills reflecting incurred expenses to QBE beginning on November 16, 2005, with additional bills submitted thereafter. To pay these bills, Royal Marco spent money from its operating account and, by January 2006, had exhausted its maintenance reserves, which totaled $789,000 at the time of the hurricane. In response, Royal Marco was forced to assess a levy of $437,500 on its unit owners for repair costs.

In a February 14, 2006 report sent to QBE, AAC requested partial payment of Royal Marco's claim in the amount of $475,060.75, reflecting undisputed amounts clearly owed in excess of the deductible. In that report, AAC stated that Royal Marco "is doing everything they can to keep costs to a minimum", is "sincere in their attempts to return the property to pre-hurricane conditions and [is] not attempting to better the property unless it is at [its] own expense", and "ha[s] incurred costs far exceeding their deductible and [is] looking to be reimbursed for these expenses as soon as possible." (Doc. 221, Exh. D).

QBE, however, did not make its first payment to Royal Marco until March 16, 2006, and then only in the amount of $250,000. Royal Marco hired counsel and engaged its broker to attempt to secure payment, but additional payments from QBE were insufficient to keep pace with repair invoices being submitted for reimbursement, which exceeded $4 million by April 2006. On March 28, 2006, Royal Marco took out a line of credit from Marco Community Bank to attempt to meet these repair costs.

On November 30, 2006, Royal Marco filed a Civil Remedy Notice of Insurer Violation ("CRN"), citing claim denial/delay, unfair trade practice and unsatisfactory settlement offer. In December 2006, QBE offered to pay an additional $1,476,302.87 to settle Royal Marco's claim,

beyond the deductible amount of $719,858 and payments already made by QBE totaling $1,842,000. Royal Marco rejected the offer, claiming the offer was more than $2 million short of the amount needed to pay its repair costs.

In December 2006, Royal Marco levied another assessment of $848,125 on its unit owners. On January 18, 2007, Royal Marco secured a $1.5 million small business loan ("SBA loan") with the U.S. Small Business Administration.

On January 12, 2007, Royal Marco filed suit against QBE. On March 22, 2007, QBE invoked the appraisal process pursuant to the Policy. The Court, through a Magistrate Judge, issued a Report recommending that appraisal be compelled. Both parties filed objections to the Report. Eventually, in December 2007, the parties agreed to enter into the appraisal process. On March 20, 2008, Royal Marco filed a supplemental claim for additional damages in the amount of $886,637.05, which it requested be included within the scope of the appraisal. QBE rejected this suggestion, however. On May 8, 2008, Royal Marco filed a CRN pertaining to the supplemental claim, alleging claim denial/delay, unfair trade practice and an unsatisfactory settlement offer.

On June 8, 2008, an appraisal award was entered for $2,244,455, less prior payments already made by QBE in the amount of $1,275,391. On June 25, 2008, QBE paid Royal Marco the appraisal award balance of $869,064 (offset by agreement of the parties for $100,000 for non-covered items). At Royal Marco's request, the Court confirmed the appraisal award, over QBE's objection. On August 18, 2008, QBE paid $44,911.36 to Royal Marco on its supplemental claim.

Thereafter, on September 5, 2008, Royal Marco filed its Second Amended Complaint alleging two counts: breach of insurance contract and statutory bad faith pursuant to Fla. Stat. §

624.155. On February 18, 2009, this Court approved the parties' joint stipulation to dismiss the breach of contract count with prejudice.

**II. Summary Judgment Standard**

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; see also *Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). However, "'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,'" *Wiley v. U.S.*, 20 F.3d 222, 227 (6th Cir. 1994) (quoting *Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; see also *Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

**III. Discussion**

*A. Sufficiency of the CRNs*

QBE contends that it is entitled to summary judgment because the CRNs Royal Marco filed in connection with its bad faith claim violated the specificity requirements of Fla. Stat. § 624.155 by not "providing a specific dollar amount" so as to allow QBE to cure the alleged violations.

5

Filing a CRN is a condition precedent for bringing a bad faith action against an insurer under Florida law. Fla. Stat. § 624.155(3)(a). The notice is to be given on a form provided by the Florida Department of Financial Services and must "state with specificity" the following: the statutory provisions allegedly violated by the insurer; the facts and circumstances giving rise to the violation; the names of the individuals involved; reference to specific policy language relevant to the violation; and a statement why notice is being given. Fla. Stat. § 624.155(3)(b).

The case law on the subject is clear that "a specific cure amount is not necessary to validate a Civil Remedy Notice." *Porcelli v. OneBeacon Ins. Co., Inc.*, 635 F.Supp.2d 1312, 1318 (M.D. Fla. 2008); cf. *Vest v. Travelers Ins. Co.*, 753 So.2d 1270, 1275 (Fla. 2000) ("[T]here is no statutory requirement which prevents the insured from sending the statutory notice before there is a determination of liability or damages."). Review of the CRNs filed by Royal Marco reflects that they provided sufficient detail so as to comply with § 624.155, even though they lacked a specific cure amount, and thus QBE's argument on this point is not well-taken.

## *B. Royal Marco's Damages Claims*

Next, QBE argues that Royal Marco's claims for property damages are improper, because these damages were caused by Hurricane Wilma and were thus not a "direct consequence" of any bad faith by QBE. But there is no support in the case law for the proposition that the insurer must have been the sole cause of the insured's underlying loss in order to permit recovery in a bad-faith action. Instead, the Florida bad faith statute "creates an economic incentive for insurers to settle claims in good faith" by raising the specter of "potentially large bad-faith damages" where "an insurance company acts in bad faith by dragging out disputes and forcing a lawsuit simply to delay paying the insured". *Kearney v. Auto-Owners Ins. Co.*, 664 F.Supp.2d 1234, 1245 (M.D.Fla.

6

2009). The statute thus permits recovery for any damages that are a "reasonably foreseeable" result of the insurer's bad-faith conduct. Fla. Stat. § 624.155(8). "These damages include interest, court costs and reasonable attorney's fees incurred in both the bad faith litigation and in the resolution of the underlying claim as a result of the insurer's conduct in delaying payment." *Brookins v. Goodson*, 640 So.2d 110, 113-114 (Fla. 4th DCA 1994).

The Court is satisfied that there is sufficient evidence in the record to support a jury finding that Royal Marco's claimed damages were a "reasonably foreseeable" and direct consequence of QBE's alleged bad-faith conduct. Such damages may include "reasonable attorney's fees" incurred either in the underlying action or the subsequent bad faith action, and thus Royal Marco's claim for attorney's fees cannot be dismissed at this time.

QBE also contends that the earlier appraisal award in this matter has res judicata and collateral estoppel effect as to Royal Marco's claims for bad-faith damages. But the appraisal award was based on Royal Marco's breach of contract claim, not its bad faith claim, and it is well-settled that "[a] claim arising from bad faith is grounded upon a legal duty to act in good faith, and is thus separate and independent of the claim arising from the contractual obligation to perform." *Blanchard v. State Farm Mutual Automobile Ins. Co.*, 575 So.2d 1289, 1291 (Fla.1991); see also *Dadeland Depot, Inc.*, 483 F.3d at 1271-1272 (11th Cir.2007) (holding that insured was not barred from asserting separate bad faith action against insurer despite the fact that insured could have brought bad faith claim in its earlier arbitration proceeding). Because Royal Marco seeks recovery at present for damages allegedly caused by QBE's bad faith, and not breach of contract, its claims are not barred by res judicata or collateral estoppel.[1]

---

[1] For similar reasons, the Court declines to dismiss Royal Marco's claims for its appraisal costs,

*C. QBE's Participation in the Appraisal Process*

Relying heavily on *316, Inc. v. Maryland Casualty Co.*, 625 F.Supp.2d 1187 (N.D. Fla. 2008), QBE contends that Royal Marco cannot show that it acted in bad faith because QBE participated in the appraisal process and paid the appraisal award in a timely matter. According to QBE, these facts show that it acted in good faith as a matter of law.

Florida's bad faith statute obligates an insurer to act "fairly and honestly toward its insured," and "with due regard for her or his interests." Fla. Stat. § 624.155. This statutory duty "is grounded in the common law obligation of good faith that was traditionally imposed on insurers, which obligated insurers to 'refrain from acting solely on the basis of their own interests' rather than those of the insured party." *Dadeland Depot, Inc. v. St. Paul Fire and Marine Ins. Co.*, 483 F.3d 1265, 1276 (11th Cir. 2007) (quoting *Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So.2d 555, 558 (Fla. 4th DCA 2003)). Thus, a bad faith claim "is founded upon the obligation of the insurer to pay when all conditions under the policy would require an insurer exercising good faith and fair dealing towards its insured to pay", an obligation which "requires the insurer to timely evaluate and pay benefits owed on the insurance policy." *Vest*, 753 So.2d at 1275 (Fla. 2000). The determination of whether the insurer has acted in good faith is fact-intensive and thus typically for the jury. See *Dadeland Depot*, 483 F.3d at 1278 n. 10 (collecting cases).

The Court does not agree with QBE that *316* controls this case. In *316*, the Court found that the insurer "moved with reasonable promptness" to resolve the claim where the insurer began making payments to the insured within two months of the loss, paid $3.8 million under the policy

---

despite the contractual language indicating that such fees would be split. Because Royal Marco alleges that it would not have had to undergo appraisal but for QBE's bad-faith delay in settlement, such costs would appear to be consequential damages authorized by the statute.

8

over the course of the next five months, and invoked its right to appraisal within the next two months, prior to the insured filing a CRN. *316*, 625 F.Supp.2d at 1192-1193. The *316* Court also noted "the complicated nature of the claim"in finding that the insurer had acted in good faith, and made clear that its analysis did not apply to "the usual bad-faith claim where damages are obvious and it is clear that the damages will exceed policy limits, but the insurer insists on dragging out the payment process." *Id*. at 1193.

In the instant case, by contrast, QBE did not make any payments for nearly five months after Royal Marco filed its claim and did not invoke appraisal until nearly a year later, after filing of the instant lawsuit. Moreover, there is evidence in the record in the instant case, beyond the fact of the subsequent appraisal award, plausibly suggesting that QBE dragged out the claims process and did not promptly pay money it knew it owed under the policy. For example, it is unclear why QBE apparently made an initial payment to Royal Marco in March 2006 that was significantly less than the $475,060.75 recommended by its adjuster despite knowing of Royal Marco's urgent need for funds.

In sum, this is not one of those "rare cases" where the Court may rule on the bad faith issue as a matter of law at the summary judgment stage. *Kearney*, 664 F.Supp.2d at 1243.

### *D. Royal Marco's Punitive Damages Claim*

For substantially the same reasons outlined in this Court's earlier opinion regarding Royal Marco's proffer of evidence in support of its punitive damages claim (Doc. 229), the Court finds that Royal Marco has demonstrated an adequate evidentiary basis to permit discovery to proceed on this matter, and thus declines to dismiss Royal Marco's punitive damages claim.

### **IV. Conclusion**

For the foregoing reasons, QBE's motions for summary judgment (Doc. 216) and to dismiss or strike the punitive damages claim (Doc. 142) are denied.

IT IS SO ORDERED.

                                                      s/ *David A. Katz*
                                                      DAVID A. KATZ
                                                      U. S. DISTRICT JUDGE